[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-10993
_____

D.C. Docket No. 9:12-cv-81311-DMM


UNITED STATES COMMODITY
FUTURES TRADING COMMISSION,

Plaintiff - Appellee,

versus

HUNTER WISE COMMODITIES, LLC, et al.,

Defendants,

HAROLD EDWARD MARTIN, JR.,
FRED JAGER,

Defendants - Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(April 15, 2014)

Before MARCUS, DUBINA and WALKER,[*] Circuit Judges.

DUBINA, Circuit Judge:

This is an appeal from the district court's grant of a preliminary injunction. Amendments to the Commodity Exchange Act ("the Act") made by the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 purport to expand the enforcement authority of the Commodity Futures Trading Commission ("the Commission"). Pub. L. No. 111-203, 124 Stat. 1376, 1732–33 (effective July 16, 2011) ("Dodd-Frank"); *see also* 7 U.S.C. § 2 (drawing the contours of the Commission's jurisdiction). Among other things, the Dodd-Frank amendments authorize the Commission to regulate retail commodity transactions offered "on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis." Dodd-Frank § 742, 124 Stat. at 1732–33 (codified at 7 U.S.C. § 2(c)(2)(D)). This case presents a question of first impression in this or any circuit regarding whether that amendment actually expands the Commission's enforcement authority. After careful consideration of the record and, with the benefit of oral argument, we hold that it does. Because the Commission has authority to regulate the transactions alleged in this case and the requirements for a preliminary injunction are satisfied,

---

[*]Honorable John Walker, Jr., United States Circuit Judge for the Second Circuit Court of Appeals, sitting by designation.

this court affirms the district court's grant of a preliminary injunction.

## I.  BACKGROUND

The Commission brought a civil enforcement action alleging that twenty defendants violated the Act by conducting off-exchange and fraudulent retail commodity transactions.  *See, e.g.,* 7 U.S.C. §§ 6(a), 6b (prohibiting off-exchange and fraudulent commodity futures transactions).  A number of defendants objected that the Commission lacked statutory authority for the enforcement action; the district court rejected their arguments, granted a preliminary injunction, and appointed a special monitor to administer the business entities involved.  Two defendants, the sole officers and members of the commodity brokerage firm at the center of the case, now appeal that injunction.

Appellants insist that their brokerage firm, Hunter Wise, [1] bought and sold precious metals, which it would then sell to retail customers via a network of dealers.  But according to the Commission's complaint and the district court's factual findings, Hunter Wise did not actually trade, store, or transfer any metals.  *Commodity Futures Trading Comm'n v. Hunter Wise Commodities, LLC*, No. 12-81311-CIV, 2013 WL 718503, at *7 (S.D. Fla. Feb. 26, 2013) ("*Hunter Wise*").  Instead, Hunter Wise managed its risk exposure from customers' trading positions

---

[1] Four limited liability companies comprise "Hunter Wise," and the court uses the term to refer to them collectively.  Hunter Wise Commodities is a holding company, while Hunter Wise Trading, Hunter Wise Credit, and Hunter Wise Services are its wholly owned subsidiaries.

3

not by holding a physical inventory of metals for customers but by trading derivatives in its own margin trading accounts with precious metals trading companies. *Id.*

A.    *The Transactions' Participants*

The first of the four categories of players in these transactions includes Hunter Wise and its members and managers, Appellants Harold Martin and Fred Jager.[2]   Martin was responsible for Hunter Wise's day-to-day operations as Chief Operating Officer, while Jager served as Chief Executive Officer. Together, the Hunter Wise entities offered market access, financing, and a technology platform for retail precious metals dealers.

Hunter Wise engaged those dealers via the Lloyds entities, the second group of participants. Acting together, three Lloyds entities – a holding company and two affiliated companies – served as an intermediary to recruit the dealers to execute retail transactions on behalf of Hunter Wise. All three Lloyds entities share the same two members and managers, James Burbage and Frank Gaudino, who, along with the entities they own and manage, are defendants. The registered agent for the holding company Lloyds Commodities, LLC, is J.B. Grossman, P.A., a law firm that previously represented Hunter Wise and continues to represent

---

[2] Martin and Jager initially attempted to appeal on behalf of Hunter Wise as well, but the special monitor appointed to administer the entities as a result of the preliminary injunction prevented that.

Appellants Martin and Jager. Grossman himself is the registered agent for Lloyds Services, LLC. Additionally, Lloyds Credit, LLC, shares a business address with Hunter Wise. These facts paint the picture that the relationship between Hunter Wise and Lloyds is not an arm's-length one. By all indications, Lloyds exists only as a pass-through for Hunter Wise's business with dealers.

The dealers are the third category of players and the last group of defendants. Each is a telemarketing firm that solicited retail customers for commodity transactions, and each made an agreement with Lloyds, whereby Lloyds agreed to provide services to facilitate sales to retail customers. The evidence before the district court, however, was that Lloyds provided dealers no different or additional services from those provided by Hunter Wise. The Commission named five dealers and their four managers as defendants.[3]

The fourth category of participants consists of retail customers. Dealers solicited retail customers by telephone and internet, touting physical metals as safe investments. While a fraction of transactions were not financed, the Commission's enforcement action applies only to those that were. Customers typically made a down payment of 25% and then received a loan for the balance of the purported

---

[3] The dealers and managers named are: CD Hopkins Financial and Hard Asset Lending Group, both LLCs whose sole member is Chadewick Hopkins; Blackstone Metals Group, LLC, which acquired CD Hopkins's client accounts, and its sole member, Baris Keser; Newbridge Alliance, Inc., and its Chief Executive Officer, John King; and United States Capital Trust, LLC, and its sole member, David Moore.

purchase price.  The credit agreement, extended to dealers for customers' benefit, would mature in four years.  (R. 39-1 at 16, ¶ 3.1.)[4]  After completing a transaction, retail customers could trade based on price movements.  The values of customers' accounts fluctuated with the price of metals and were subject to depletion because of fees, commission, and interest charges.  None of the transactions with retail customers occurred on a regulated commodity exchange.

B.    *The Enterprise and Hunter Wise's Role*

Hunter Wise provided the financing made available to retail customers and administered the transactions.  The lending arm of Hunter Wise would extend credit to the dealer, and the dealer in turn would extend credit to the customer.  When a customer agreed to make a financed purchase, a sales agent would hold the customer on the line while placing the order at a price determined by Hunter Wise.  Hunter Wise would enter the order in its database and approve it, at which point the order was complete.

Moreover, Hunter Wise assisted dealers in marketing metals and managing the transactions with retail customers.  It provided training materials, including sales pitch scripts, educational videos, and policy and procedure manuals, for dealers' employees.  Hunter Wise gave dealers administrative support in the form

---

[4] Document numbers in record citations refer to the document number assigned by the electronic filing system in the district court.  Similarly, and in the interest of consistency, page numbers refer to the page numbers assigned by the electronic filing system in the district court.

of standard form contracts, bookkeeping, and account management services.

Hunter Wise also provided access to an internet-based system called "the Portal." There, Hunter Wise maintained account and trading records for all dealers' retail customers' transactions, accessible to both retail customers and dealers. Customers could view their accounts and transaction information, including monthly account statements and reports. The reports appeared to be from individual dealers, but in actuality, Hunter Wise generated them. One report, the "Transfer of Commodity Notice," purported to transfer precious metals into or out of customers' accounts but, according to the district court's findings, did not give the customers any right to possess or control actual metals.

Funds passed from the customer to the dealer to Lloyds and finally to Hunter Wise with the dealers and Lloyds each taking a cut along the way. Customers incurred fees and costs associated with trading, including a commission to dealers, a price spread, and interest. Dealers required retail customers to maintain 15% of their account in equity, and if the equity fell below that figure, the customer would receive a margin call, requiring him to deposit additional funds to maintain his trading position. Accounts were subject to a minimum margin requirement, such that if equity dropped below 9%, open trading accounts were liquidated to protect dealers and Hunter Wise. (R. 4-20 at 28 (retail customer account opening explaining that dealer reserves right to demand additional collateral or liquidate all

7

or part of collateral "without any prior notice to the client"); R. 4-19 at 89 (deposition testimony explaining Hunter Wise's Portal procedures for an "equity call" and "force level").)

This margin trading system mirrored Hunter Wise's trading accounts with a number of precious metals trading companies, which actually maintain physical precious metals inventories. Hunter Wise's account with A-Mark Precious Metals, Inc., for example, was subject to the same sort of equity requirements as those of retail customers using the Portal. A-Mark required a baseline equity figure of 15%, with margin call coming at 10%. (R. 4-17 at 25; *see also* R. 4-17 at 53 (describing Hunter Wise's similar arrangement with another precious metals trader, Standard Bank).)

Like its customers, Hunter Wise owned no metals unless it made full payment. Though Hunter Wise occasionally purchased or sold physical metals, the vast majority of its transactions were margin trades. (R. 4-17 at 24, 52.) The district court found that the trading companies delivered no metal to Hunter Wise such that it could make deliveries to retail customers. The trading companies would only deliver metals to Hunter Wise if Hunter Wise paid in full, something it never did on margin trades, and no title to physical metals passed as a result of Hunter Wise's margin trades with the trading companies. (R. 4-17 at 25–26, 54). Based on this evidence, the district court found that Hunter Wise had no inventory

8

of metals from which it could deliver to the Portal's retail customers.

## C.    Procedural History

The Commission filed this enforcement action, seeking injunctive and equitable relief as well as statutory penalties under the Act, and immediately moved for a preliminary injunction. Appellants and Hunter Wise, along with other defendants, opposed the preliminary injunction and moved to dismiss on the basis that the Commission lacked statutory authority to regulate the transactions. After a hearing, the district court granted the motion for preliminary injunction. The district court found that the transactions were subject to the Commission's enforcement authority under 7 U.S.C. § 2(c)(2)(D) because they were financed commodity transactions made with retail customers. Further, the district court concluded that the Commission presented a prima facie case of illegality and a likelihood of future violations. Martin and Jager then perfected this appeal.

## II.  STANDARD OF REVIEW

This court reviews a trial court's decision to grant a preliminary injunction for abuse of discretion. *Sec. & Exch. Comm'n v. ETS Payphones, Inc.*, 408 F.3d 727, 731 (11th Cir. 2005); *see also Commodity Futures Trading Comm'n v. Walsh*, 658 F.3d 194, 198 (2d Cir. 2011) (reviewing for abuse of discretion the decision to grant a preliminary injunction in a civil enforcement action brought by the Commission). We review the underlying findings of fact for clear error and

9

questions of law *de novo*. *ETS Payphones*, 408 F.3d at 731. A finding of fact is clearly erroneous if, upon reviewing the evidence as a whole, we are "left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer*, 470 U.S. 564, 573, 105 S. Ct. 1504, 1511 (1985) (internal quotation marks omitted); *Fed. Trade Comm'n v. AbbVie Prods. LLC*, 713 F.3d 54, 69 (11th Cir. 2013) (quoting *Anderson*).

### III.  PRELIMINARY INJUNCTION STANDARD

A court deciding whether to issue a preliminary injunction under the Act does not employ the familiar preliminary injunction formula, which requires that a plaintiff clearly establish a substantial likelihood of success on the merits and the likelihood of irreparable injury, among other things. *Commodity Futures Trading Comm'n v. Muller*, 570 F.2d 1296, 1300 (5th Cir. 1978).[5] Rather, the standard is lower. The Act enables district courts to issue permanent or temporary injunctions "[u]pon a proper showing" and without bond. 7 U.S.C. § 13a-1(b). A prima facie case of illegality is a "proper showing." *Muller*, 570 F.2d at 1300. Binding precedent in this circuit suggests, and other circuits have held, that where the Commission seeks to enjoin future violations, it must also show a reasonable likelihood of future violations in addition to a prima facie case of illegality. *Id.*

---

[5] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

(opining that had the Commission sought an injunction of future violations, it might be necessary to show a likelihood of future violations); *Commodity Futures Trading Comm'n v. Co Petro Mktg. Grp.*, 680 F.2d 573, 582 n.16 (9th Cir. 1982) (noting the future violations requirement, as applied to a permanent injunction); *Commodity Futures Trading Comm'n v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979) (requiring a showing of the likelihood of future violations).

## IV.  DISCUSSION

Martin and Jager argue the Commission's statutory authority, its "jurisdiction," does not reach the transactions at issue, but we note at the outset that this is not a matter of the court's jurisdiction to hear this case.  The district court had subject matter jurisdiction over the Commission's claims pursuant to both 28 U.S.C. § 1331, because they arise under federal law, and 7 U.S.C. § 13a-1(a), which allows the court to grant injunctive relief for violations of the Act. Instead, this appeal presents a question of the Commission's authority to bring this enforcement action.  Martin and Jager's argument is akin to a claim that there is no cause of action for a preliminary injunction (or otherwise) under the Act and that the Commission has therefore not stated a claim to relief.

When the Commission brought this action, it asserted its authority under § 742 of the Dodd-Frank Act, codified at 7 U.S.C. § 2(c)(2)(D).  The relevant portion of that provision reads:

11

**(D)    Retail commodity transactions**

**(i)  Applicability**

Except as provided in clause (ii), this subparagraph shall apply to any agreement, contract, or transaction in any commodity that is –

**(I)**    entered into with, or offered to (even if not entered into with), a person that is not an eligible contract participant or eligible commercial entity; and

**(II)**    entered into, or offered (even if not entered into), on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis.

7 U.S.C. § 2(c)(2)(D).

The Commission enjoys authority over covered retail commodity transactions so long as no exception applies.  *See id.* § 2(c)(2)(D)(ii) (listing exceptions).  Covered transactions are subject to the Act's prohibitions on off-exchange trading and fraud.  *Id.* § 2(c)(2)(D)(iii); *see also id.* § 6(a) (prohibiting commodity futures transactions not subject to the rules of an exchange); *id.* § 6b (prohibiting fraud and misrepresentation in connection with commodity transactions).  Because the Commission enjoys statutory authority over these transactions and has pleaded a prima facie case of illegality, the district court's

12

grant of a preliminary injunction is due to be affirmed.

A.     *The retail transactions at issue are subject to the Commission's jurisdiction.*

The Commission enjoys authority to regulate certain retail commodity transactions.  Transactions are "retail" if they are entered with or offered to "a person that is not an eligible contract participant or eligible commercial entity."  *Id.* § 2(c)(2)(D)(i)(I).  There is no dispute that the customers who entered contracts through Hunter Wise's Portal are not eligible contract participants.  And, as the customers are individuals, they are not eligible commercial entities.  *See id.* § 1a(17)–(18) (defining "eligible commercial entity" and "eligible contract participant," respectively).  Thus, these transactions were retail.

Still, the provision does not cover all retail commodity transactions; only those entered into or offered "on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis" fall within the Commission's jurisdiction.  *Id.* § 2(c)(2)(D)(i)(II).  The Act's definitions section does not define "leveraged" or "margined" or otherwise explain what it means for a transaction to be entered into or offered on a "leveraged" or "margined" basis.  *Id.* § 1a.  Nor does it explain what it means to be "financed . . . on a similar basis," or to what "on a similar basis" refers.  *Id.*  The district court found that because the dealers – in cooperation with Hunter Wise – financed the transactions, the Commission's authority reached

the transactions.  *See Hunter Wise*, 2013 WL 718503, at *8 ("[A]t the very least, Hunter Wise acted in concert with those offering financed transactions.").

Martin and Jager rely on a definition of leveraged found elsewhere in the Act to argue these transactions differ so fundamentally from leveraged transactions that one cannot characterize them as financed on a similar basis to margined or leveraged transactions, or as margined or leveraged themselves.  They point to 7 U.S.C. § 23, where the Act prohibits commodity transactions "under a standardized contract commonly known to the trade as a margin account, margin contract, leverage account, or leverage contract," except as authorized.  *Id.* § 23(a).  Under Commission regulations effectuating that prohibition, a leverage contract has standardized terms and conditions and is "for the long-term (ten years or longer) purchase . . . or sale" of a leverage commodity by a leverage customer.  17 C.F.R. § 31.4(w).  A leverage transaction, by extension, is a deal to exchange a leverage contract.  17 C.F.R. § 31.4(x).  Martin and Jager insist the terms "leverage account" or "leverage contract," as used in 7 U.S.C. § 23 and defined in 17 C.F.R. § 31.4(w), and "contracts . . . entered into . . . on a leveraged . . . basis," as used in 7 U.S.C. § 2, have the same meaning and durational requirement.  Because leverage contracts endure for ten years or longer while the transactions made through Hunter Wise's Portal mature in just four years, Martin and Jager argue that the Portal transactions cannot be "leveraged" or financed on a basis similar to a

14

leveraged transaction and that 7 U.S.C. § 2(c)(2)(D) therefore cannot authorize this action.  Martin and Jager are wrong.

"As with any question of statutory interpretation, we begin by examining the text of the statute to determine whether its meaning is clear."  *Silva-Hernandez v. U.S. Bureau of Citizenship Servs.*, 701 F.3d 356, 361 (11th Cir. 2012) (internal quotation marks omitted).

First, the ordinary meanings of the terms used in § 2(c)(2)(D) do not support Martin and Jager's argument.  When interpreting a statute and confronted with undefined terms, we give those terms their plain and ordinary meaning "because we assume that Congress uses words in a statute as they are commonly understood."  *Polycarpe v. E&S Landscaping Serv., Inc.*, 616 F.3d 1217, 1223 (11th Cir. 2010) (internal quotation marks omitted); *see also Marx v. Gen. Revenue Corp.*, __ U.S. ___, 133 S. Ct. 1166, 1172 (2013) (observing that when interpreting a statute, courts "assume that the ordinary meaning of the statutory language accurately expresses the legislative purpose" (internal quotation marks and alterations omitted)).  We therefore interpret § 2(c)(2)(D) to use the terms "leveraged" or "margined" as those terms are commonly understood.  According to their ordinary meaning, margin and leverage are related concepts; leverage denotes "[t]he use of credit or borrowed funds (such as buying on margin) to improve one's speculative ability and to increase an investment's rate of return," while a margin

15

is "[t]he amount of an investor's equity in securities bought on credit through the broker." *Black's Law Dictionary* 990, 1053 (9th ed. 2009). Hunter Wise defined leverage similarly in a memorandum to its holding company's potential investors; it explained its operations by describing leverage as "the use of a smaller amount of capital to do the work of a much larger amount." (R. 4-4 at 21.) Taken together, leveraging refers generally to the ability to control high-value amounts of a commodity or a security with a comparatively small value of capital, known as the margin.[6] These commonly understood meanings impose no specific durational requirement, ten years or otherwise.

Second, there is no statutory authority for the position that the term "leveraged" as used in § 2(c)(2)(D) "is the same language as presented" in § 23. (Appellant's Br. at 14.) The term of art "leverage contract" does not appear in § 2(c)(2)(D). The two statutory sections do not refer to one another, and § 2(c)(2)(D) contains no durational requirement. In light of this, the basis for reading such a specific requirement into § 2(c)(2)(D) is tenuous, at best.

Third, adopting the interpretation Martin and Jager advance would render §2(c)(2)(D) meaningless. While it is true that statutory language must be read in context and with a view to its place in a larger statutory scheme, *Roberts v. Sea-*

---

[6] *Glossary*, Commodity Future Trading Commission, http://www.cftc.gov/ConsumerProtection/EducationCenter/CFTCGlossary/index.htm (last visited Feb. 11, 2014).

*Land Servs., Inc.*, __ U.S. ___, 132 S. Ct. 1350, 1357 (2012), it is similarly canonical that courts must read a statute to give effect to all provisions and avoid rendering any part "inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314, 129 S. Ct. 1558, 1566 (2009) (internal quotation marks omitted). If, as Martin and Jager insist, "leveraged," "margined," and "financed" all carry the durational requirement imposed on standardized contracts in § 23, then § 2(c)(2)(D) only gives the Commission authority over what § 23 already prohibits.

While we need not defer to the agency's interpretation because the statutory text is unambiguous, *Silva-Hernandez*, 701 F.3d at 361, we note also that the interpretation the court adopts today harmonizes with the Commission's own informal interpretation. The Commission understands its jurisdictional grant under § 2(c)(2)(D) to be "in addition to, and independent from," § 23. Retail Commodity Transactions Under Commodity Exchange Act, 76 Fed. Reg. 77670-02, 77671 n.7 (Dec. 14, 2011); *see Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S. Ct. 161, 164 (1944) (holding that informal agency interpretations "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance").

Likewise, though we need not resort to legislative history, we note that it also complements our interpretation and the plain meaning of the terms. *See*

17

*Harris v. Garner*, 216 F.3d 970, 977 (11th Cir. 2000) (considering legislative history, though strictly unnecessary in light of the plain meaning of the statute at issue, because it "support[ed] and complement[ed]" the statutory language's plain meaning).  Recounting the efforts of the Committee that drafted the bill, Senator Lincoln reported during debate that the Dodd-Frank amendments to the Act expanded the Commission's enforcement authority and were "intended to be both additive and complementary to the authorities" already existing.  156 Cong. Rec. S5920, S5924-5 (daily ed. July 15, 2010) (offering the written report "to provide clarifying legislative history").  This harmonizes with the conclusion that § 2(c)(2)(D) adds to the Commission's enforcement authority, rather than simply giving the Commission authority to regulate a more narrow class of standardized contracts prohibited elsewhere.

In light of our conclusion about § 2(c)(2)(D)'s reach, the inquiry becomes whether the Portal transactions are leveraged, margined, or similarly financed and therefore subject to the Commission's authority.  The Commission alleged the transactions were, and the district court did more than accept the truth of those allegations when it found that the Commission had enforcement authority.[7]  It held a hearing, where the Commission produced evidence that Hunter Wise itself

_____

[7] We need not reach the question of whether it is enough, to establish its enforcement authority, for the Commission to merely allege the nature of these transactions – a question the parties themselves do not raise.

18

characterized its business to include financing and providing a "'back office'

platform for a network of Authorized Independent Dealers that transact leveraged

sales in precious metals." (R. 4-4 at 21.)  Moreover, the Commission showed that

when customers' trading positions fell below a minimum margin requirement,

dealers would initiate a margin call and liquidate open trading positions.  (R. 4-11

at 68; R. 4-20 at 28.); s*ee also Hunter Wise*, 2013 WL 718503, at *6 (making

factual findings to this effect).  Review of the evidence presented at this stage does

not leave us with a definite and firm conviction that the district court erred in its

factual findings regarding the nature of the transactions, and after *de novo* review,

we confirm its legal conclusion that § 2(c)(2)(D) covers the transactions.

Lastly, Martin and Jager's insistence that Hunter Wise was a wholesaler not

engaged in the retail transactions cannot save them from § 2(c)(2)(D)'s reach.  The

Commission alleges Hunter Wise controlled the entire scheme with a tight fist, and

it is beyond dispute that Hunter Wise at least had its fingers – if not its hands – in

each stage of the scheme.  The evidence demonstrated that Hunter Wise

administered the Portal, extended credit to retail customers through the dealers, and

finalized retail customers' transactions.  (R. 4-2 at 25–26, ¶¶ 53–59; R. 4-8 at 9; R

4-12 at 126–27; R. 64-3 at 21.)  Moreover, the Commission's jurisdiction is over

the transactions themselves.  *See* 7 U.S.C. § 2(c)(2)(D) (providing that the

Commission's enforcement authority "shall apply to any agreement, contract, or

transaction in any commodity" covered by the subparagraph). The court could assume the truth of Martin and Jager's assertions that Hunter Wise's dealings with Lloyd's and the dealers were arm's-length, dealer-to-dealer transactions, and yet the Commission would still have authority to regulate the transactions under § 2(c)(2)(D).

B.    *No exception to the Commission's jurisdiction applies.*

The Dodd-Frank amendments to the Act on retail commodity transactions also include certain exceptions to the Commission's authority, including exceptions for certain contracts of sale resulting in actual delivery or which create an enforceable obligation to deliver between parties with the ability to deliver. 7 U.S.C. § 2(c)(2)(D)(ii)(III). Martin and Jager argue that these exceptions apply and remove the transactions from the Commission's authority. Their arguments rest on the supposition that the retail customers using Hunter Wise's Portal were buying and selling actual interests in metals, not trading on margin, and that Hunter Wise possessed or controlled metals it could deliver. The district court concluded, as a matter of fact, that Hunter Wise had never taken delivery of any metals as a result of its trades and had no metals to deliver in connection with these retail commodity transactions. *Hunter Wise*, 2013 WL 718503, at *7. Because those findings were not clearly erroneous, we conclude that the district court did not err when it found that the exceptions did not apply.

1.    Actual Delivery Exception

The Commission's authority to regulate retail commodity transactions does not extend to "a contract of sale that results in actual delivery within 28 days or such other longer period as the Commission may determine by rule or regulation based upon the typical commercial practice in cash or spot markets for the commodity involved."  7 U.S.C. § 2(c)(2)(D)(ii)(III)(aa).  There is no dispute over the delivery period; the question is whether Hunter Wise's transactions ever resulted "in actual delivery."

Because the Act does not define the term "actual delivery," 7 U.S.C. § 1a, we again refer to the ordinary meaning of the term to interpret the statute. *Polycarpe*, 616 F.3d at 1223.  "Delivery" is "[t]he formal act of transferring something"; it denotes a transfer of possession and control.  *Black's Law Dictionary* 494 (9th ed. 2009).  "Actual delivery" denotes "[t]he act of giving real and immediate possession to the buyer or the buyer's agent."  *Id.*  "Actual" is that which "exist[s] in fact" and is "real," rather than constructive.  *Id.* at 40.

Martin and Jager rely on the definition of delivery found in the Uniform Commercial Code (the "Code") to sustain their argument that the Portal transactions fall under the actual delivery exception.  They point to Article 2 of the Code, which defines "delivery," with respect to goods, to mean "the voluntary transfer of physical possession or control."  U.C.C. § 2-103(1)(e).  Martin and

21

Jager argue that the Transfer of Commodity Notices transmitted to retail customers via the Portal effectuated "delivery" under the Code and "actual delivery" under § 2(c)(2)(D)(ii).

First, Martin and Jager are wrong in their belief that the Code applies. Setting aside potential preemption problems posed by the Code's application, only a tortured reading would make the "typical commercial practice" phrase an implicit reference to a method of delivery, rather than the period for delivery. The exception refers to the typical commercial practice in a clause setting out an alternative period in which actual delivery may take place. The exception enables the Commission to determine an alternative deadline, longer than twenty-eight days, for actual delivery[8] and instructs the Commission to set that period "based upon the typical commercial practice." 7 U.S.C. § 2(c)(2)(D)(ii)(III)(aa). By its plain reading, the exception does not use "typical commercial practice" to refer to the form of delivery, electronic versus physical or otherwise.

Second, Martin and Jager's urging that we graft the Code's definition of "delivery" onto the exception ignores the modifier preceding that term in the exception: Delivery must be *actual*. The sequence of events contemplated by Martin and Jager – in which the electronic transfer of documents indicating control or possession effectuates delivery without physical transfer of the commodity – is

_____

[8] The Commission has yet to adopt regulations permitting a longer actual delivery period.

22

by any definition constructive, rather than actual. *Black's Law Dictionary* 494 (9th ed. 2009) (defining "constructive delivery" as "[a]n act that amounts to a transfer of title by operation of law when actual transfer is impractical or impossible"). We need not define the precise boundaries of "actual delivery" here, as we can say with confidence that the exception does not cover the sort of constructive delivery Martin and Jager insist occurred. Moreover, we cannot interpret the exception with a myopic focus on the term "delivery" at the expense of other language. If "actual delivery" means anything, it means something other than simply "delivery," for we must attach meaning to Congress's use of the modifier "actual." *See Corley*, 556 U.S. at 314, 129 S. Ct. at 1566 (restating "one of the most basic interpretive canons": that statutes must be construed to avoid rending language inoperative).

Third, even if we accepted for the sake of argument that the Code applied, these transactions still would not result in "delivery" as the term is used in the Code, much less "actual delivery" as the term is used in the Act. The district court found Hunter Wise had nothing to deliver, constructively or otherwise, and on the record before us, that finding was not clearly erroneous. The evidence before the district court showed that Hunter Wise did not own a sufficient inventory of metals to cover its liabilities to the retail customers. (R. 4-17 at 25–26, 54.) Like its retail customers, the evidence showed Hunter Wise had margin trading accounts with its

23

suppliers subject to minimum margin requirements and margin calls.  (R. 4-17 at 25; R. 4-17 at 53.)  Accordingly, the district court found that Hunter Wise did not possess or control an inventory of metals from which it could deliver to retail customers, nor did Lloyds or the dealers.  While Martin and Jager contest this factual finding, after review of the entire record, we are not left with a definite and firm conviction that it was error.  Based on its sound factual finding and after *de novo* review, the district court's legal conclusion that the exception did not apply was not erroneous.

Lastly, while we need not turn to the Commission's informal interpretation because "actual delivery" unambiguously excludes the constructive delivery Martin and Jager argue occurred, we nonetheless observe that it complements our conclusion.  In an interpretative statement, the Commission opined that "actual delivery" would be satisfied, among other things, by "physical[] delivery [of] the entire quantity of the commodity purchased by the buyer, including any portion of the purchase made using leverage, margin, or financing" into possession of the buyer or a depository other than the seller's.  Retail Commodity Transactions Under Commodity Exchange Act, 78 Fed Reg. 52426, 52428 (Aug. 23, 2013).  The Commission emphasized "Congress's use of the word 'actual' to modify 'delivery'" to support its interpretation.  *Id.*  It noted specifically that a book entry purporting to show that delivery has been made or that the sale has been covered or

24

hedged would not suffice.  *Id.*  The district court's sound factual findings indicate that "delivery" as it occurred following the Portal transactions was akin to such book entries and unlike the situations the Commission said would satisfy the exception's requirements.

2.    Enforceable Obligation to Deliver Exception

The Act also excepts from the Commission's authority "a contract of sale that creates an enforceable obligation to deliver between a seller and a buyer that have the ability to deliver and accept delivery, respectively, in connection with" their lines of business.  7 U.S.C. § 2(c)(2)(D)(ii)(III)(bb).  Martin and Jager argue that: (1) these transactions created such an obligation; (2) Hunter Wise can deliver in connection with its line of business; and (3) Lloyds and the dealers can accept delivery in connection with their lines of business.

Even if the court accepted the specious arguments that these were arm's-length, dealer-to-dealer transactions (rather than transactions with retail customers) and that the transactions created some enforceable obligation to deliver, the district court found that Hunter Wise lacked the ability to deliver because it had no inventory of metals, as set out above.  Based on the officer declarations from the trading companies with which Hunter Wise held accounts, Hunter Wise never owned enough metal outright to cover its liabilities for the retail transactions at issue.  (R. 4-17 at 25–26, 54.)  Again, it cannot be said this is a clearly erroneous

25

finding of fact, nor can it be said the district court committed an error of law in concluding that the exception did not apply.

C.     *The Commission pleads a prima facie case of illegality and the likelihood of future wrongdoing.*

The Act prohibits commodity futures trading not conducted subject to the rules of a regulated exchange. 7 U.S.C. § 6(a). The Commission pleaded and presented ample evidence that the Portal transactions were subject to the Act and did not take place on any exchange. Additionally, the record supports the district court's conclusion that the Commission alleged a prima facie violation of the fraud provisions found at 7 U.S.C. § 6b. To establish liability for fraud, the Commission must prove: "(1) the making of a misrepresentation, misleading statement, or a deceptive omission; (2) scienter; and (3) materiality." *Commodity Future Trading Comm'n v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1328 (11th Cir. 2002). The Commission pleaded facts plausibly supporting those elements and offered evidence at the preliminary injunction hearing to support each element. It showed that Appellants, Hunter Wise, and their co-defendants misrepresented the nature of the Portal transactions. The Commission showed that, Hunter Wise, via the Portal, represented to retail customers that the customers were buying and selling physical metals and that dealers were storing metals in depositories on customers' behalf, (*e.g.*, R. 4-12 at 592; R. 4-20 at 44), when in fact Appellants knew Hunter Wise

26

maintained margined trading positions in metals rather than physical inventory. (R. 4-10 at 30–31; R. 4-11 at 24–25; R. 4-17 at 24–26; R. 4-17 at 53–54.)  And we have little difficulty affirming the district court's conclusion that these misrepresentations were material; a reasonable investor would consider representations about the nature of the transaction "important in deciding whether to make an investment."  *R.J. Fitzgerald & Co.*, 310 F.3d at 1328–29.  Thus, the Commission made a "proper showing," a prima facie case for the illegality of the transactions at issue.  7 U.S.C § 13a-1(b); *Muller*, 570 F.2d at 1300.

Additionally, to the extent such a showing is required to support a preliminary injunction under the Act, the district court's finding that there was a reasonable likelihood of future wrongdoing was not error.  The evidence before the district court showed – and the district court found – that the transactions were not isolated, one-time occurrences and that some defendants contested the illegality of the scheme.  In light of that evidence and pursuant to *de novo* review, we affirm the district court's legal conclusion that there was a reasonable likelihood of the transactions continuing.

D.    *The court need not reach the Commission's alternative basis for the injunction.*

The Commission argues that its allegations of Hunter Wise's use of scheme or artifice to defraud, in violation of 7 U.S.C. § 9(1), provides a separate and

27

independent basis for affirming the district court's preliminary injunction. It asserts that even if the Commission lacked authority under § 2(c)(2)(D), it still has authority under § 9(1), which applies broadly to fraud "in connection with . . . any contract of sale of any commodity in interstate commerce," irrespective of whether the transactions are margined, leveraged, or otherwise financed. *Id.* § 9(1); 17 C.F.R. § 180.1. We decline to reach this question because the Commission had authority under § 2(c)(2)(D).

## V.  CONCLUSION

Martin and Jager's arguments appear to rest in large part on their insistence that the Portal's retail customers were buying more than a margined interest in precious metals. That insistence is incompatible with the district court's factual findings at this stage, which we hold were not clear error. In light of the district court's factual findings and legal conclusions with which we agree, we hold that the Commission has enforcement authority over these transactions, and no exception applies. Because the Commission has pleaded a prima facie case of a violation of the Act, we affirm the district court's grant of the preliminary injunction.

AFFIRMED.

28