[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-13605
Non-Argument Calendar
_____

D.C. Docket No. 4:13-cr-00003-RLV-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MILES L. GAMMAGE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(June 17, 2015)

Before HULL, ROSENBAUM and BLACK, Circuit Judges.

PER CURIAM:

Miles L. Gammage, a former attorney, appeals his 70-month sentence imposed after pleading guilty to one count of mail fraud, in violation of 18 U.S.C. § 1341.  Gammage asserts two arguments on appeal:  (1) the district court erred by applying a 4-level enhancement to his guideline range under U.S.S.G. § 2B1.1(b)(2)(B) for an offense involving at least 50 victims, and (2) the district court erred in finding the offense involved sophisticated means for purposes of applying a 2-level enhancement under § 2B1.1(b)(10)(C).  Upon review, we affirm.

## I.  BACKGROUND

### A.    *Gammage's Law Firm Fraud*

Gammage was licensed to practice law in the State of Georgia from approximately June 1979 through January 2012.  Gammage owned and operated The Gammage Firm in Cedartown, Georgia, where he specialized in workers' compensation cases and represented people who were seriously injured at work. Gammage took over The Gammage Firm when his father, who founded the firm, passed away.

Over the course of The Gammage Firm's existence, The Gammage Firm had developed an excellent reputation among injured workers.  Gammage leveraged the firm's name, as well as his eloquent speaking ability, to gain clients' trust. Gammage was a "sweet talking man," which made it easy for clients to believe him and to believe the good things they had heard about The Gammage Firm.

2

Gammage's clients were also reassured by Gammage's special status as a fiduciary. They "trust[ed] in the legal system in this country" and believed Gammage's fiduciary status required him to "take care of [them] and give them what they were due."

From about January 2008 until January 2012, Gammage defrauded his injured clients out of more than $2 million. He used these stolen funds to enrich himself and to pay his law firm's payroll and operating expenses.

The scheme went as follows: Gammage settled claims on behalf of injured clients without their authorization. Thereafter, Gammage did not notify his injured clients that he had received their settlement checks. Instead, Gammage forged his clients' names on the settlement checks and deposited those checks into bank accounts he controlled for his own use. Meanwhile, his injured clients—some of whom were disabled or unable to work—struggled to make ends meet.

In order to keep the scheme going for four years, Gammage used various tactics that lulled his clients into a false sense of security and delayed their complaints to law enforcement authorities. Gammage refused to provide clients with a full and accurate accounting of their funds and delayed the disbursement of settlement funds as long as possible. When clients called to ask about their settlement money, Gammage would either not return their phone calls or make up excuses and blame others. Gammage told one client "his bank accounts were

3

frozen because of IRS problems."  He told another client "there is some kind of holdup and lots of red tape."

When Gammage's clients insisted they needed money to pay medical bills, purchase medication, and, in some instances, put food on the table, Gammage provided them partial payments, which he referred to as "advances" and "interest-free loans."

B.    *The Investigation and Guilty Plea*

In 2011, the Federal Bureau of Investigation (FBI) and Georgia Bureau of Investigation (GBI) began investigating Gammage.  At that time, the Government believed Gammage had already defrauded more than 60 of his injured clients out of more than $2 million.

The Government's investigation revealed Gammage commingled his clients' funds with his own funds.  The Government believed, among other things, Gammage committed the following acts:  deposited checks made payable to his business into his personal bank account; withdrew money from his business checking account to pay personal expenses without documentation; used the same bank account for his business and personal needs; and moved money back and forth between his business and personal accounts without documentation.

As a result of the Government's investigation, Gammage was named in a single-count information charging him with mail fraud for devising and

4

participating in a scheme to defraud his clients, in violation of 18 U.S.C. § 1341.

On January 8, 2013, Gammage signed a plea agreement, pleading guilty to the

charges in the single-count information.

C.    *Plea Colloquy*

At the plea colloquy, the Government stated it would prove the following

facts if the case proceeded to trial:

> The Defendant Gammage was licensed to practice in the State of
> Georgia from approximately June 1979 through January 2012.  He
> owned and operated the Gammage Law Firm in Cedartown, Georgia
> where he specialized in workers' compensation cases and represented
> people who were seriously injured at work.
> 
> Approximately January 2008 through January 2012, he
> converted to his own use more than $2.5 million in settlement
> proceeds entrusted to him for the benefit of his injured clients.
> 
> He used those stolen funds to pay his own expenses; to pay
> expenses of his children, and to pay the law firm payroll and operating
> expenses.
> 
> In furtherance of the scheme, he settled claims on behalf of
> injured clients without their authorization.
> 
> He deliberately ignored clients and refused to provide them
> information concerning their settlements.
> 
> He forged clients' names on settlement checks and deposited
> those checks into his own bank account.
> 
> He commingled his clients' funds with his own funds and
> refused to provide clients with a full and accurate accounting
> concerning the disposition of their funds.
> 
> He also delayed disbursing any portion of the settlement
> proceeds to his clients as long as possible.
> 
> And often clients would ask why they had not received their
> settlement funds, defendant made up excuses and blamed the delay on
> others.
> 
> When clients insisted they needed money to pay medical bills
> and purchase medication, he tried to pacify them by giving them

partial payments which he referred to as advances or interest-free loans.

By engaging in such [tactics], he lulled his clients into a false sense of security and delayed their complaints to law enforcement authorities.

Following the Government's statement of facts, the district court asked Gammage's attorney if the Government's statement was "pretty well how [Gammage] view[ed] what happened." Gammage's attorney responded "Yes, your honor. We believe that the Government would be able to show that if it proceeded." The district court asked Gammage's attorney if he wanted "to add anything to it or take anything from it or make any correction." Gammage's attorney responded "not to that statement and not to add anything at this time, reserving all for later at sentence."

The court accepted Gammage's guilty plea.

D.    *The Pre-Sentence Investigation Report*

The pre-sentence investigation report (PSI) set forth the offense conduct described at the plea colloquy and identified 86 individual "victims." A chart in the PSI provided the following victim information:  name, "funds received by Gammage," funds "paid to client," and the outstanding funds "owed to client." According to the "owed to client" column, Gammage owed 60 victims money as of the time of the chart's compilation. The chart also showed Gammage had fully reimbursed losses to fourteen victims as of the time of its compilation. By adding

6

the amounts listed in the "owed to client" column, the PSI calculated a "Total Loss and Restitution" amount of approximately $2,426,112.97.

The PSI assigned Gammage a base offense level of 7, pursuant to the applicable Guideline for Gammage's crime, U.S.S.G. § 2B1.1(a)(1).  The PSI recommended three enhancements:  (1) a 16-level enhancement, pursuant to § 2B1.1(b)(1)(I), because the intended loss was more than $1,000,000 but less than $2,500,000; (2) a 4-level enhancement, pursuant to § 2B1.1(b)(2)(B), because the offense involved at least 50 but fewer than 250 victims; and (3) a 2-level enhancement, pursuant to § 2B1.1(b)(10)(C), because the offense involved sophisticated means.  With regard to the sophisticated means enhancement, the PSI noted "Gammage forged victims' checks, commingled funds, and set up different bank accounts to conceal his fraudulent activity."  Gammage also received two additional adjustments:  (1) a 2-level upward adjustment, pursuant to § 3B1.3, for abusing a position of trust to facilitate the commission or concealment of the offense; and (2) a 3-level reduction for acceptance of responsibility.  With an adjusted offense level of 28 and a criminal history category I, Gammage faced an advisory guideline range of 78-97 months' imprisonment.

*E.*     *Gammage's Objections to the PSI*

Gammage filed a sentencing memorandum raising four objections to the PSI, only two of which are relevant to this appeal.[1]  First, Gammage objected to the § 2B1.1(b)(2)(B) enhancement for an offense involving at least 50 victims. According to Gammage, the actual number of victims was 39.  Gammage reached this number by calculating the restitution owed to each victim "through a review and reconciliation of client files, bank records, and other discovery material produced by the Government."  He presented his calculation in a two-column chart identifying the 39 clients to whom he contended some amount of restitution was still owing, as well as the specific amount that he contended each client was owed at that time.  Each of the 39 individuals listed in Gammage's chart were also identified in the four-column chart in the PSI.

Second, Gammage objected to the § 2B1.1(b)(10)(C) enhancement for an offense involving sophisticated means.  Gammage argued his scheme was "about as unsophisticated as it gets," explaining:

> While Gammage victimized many people [over] the course of years, no intricate planning was involved.  No shell corporations were used. No offshore accounts concealed funds.  No fraudulent identification papers were created or used.  No other people were required to further the scheme.  He did not make us[e] of any hidden accounts.  He simply deposited settlement checks into his trust account, lied about

---

[1] In his sentencing memorandum, Gammage also argued the total restitution amount is $1,312,375.84 and requested a downward variance based on the factors listed in 18 U.S.C. § 3553.  These objections are not relevant to this appeal.

8

possessing those funds to clients, and used those funds for his own purposes. When clients became suspicious, he did not create a false paper trail or recruit third parties to aid in his deception, he merely provided an amount of cash to each victim to alleviate their fears, referring to it as an "advance" or "interest free loan."

F.    *The Sentencing Hearing*

At the sentencing hearing, Gammage elaborated on his argument as to the total number of victims. According to Gammage, there were only 39 victims because there were only "39 people remaining with an out-of-pocket loss."

Gammage also renewed his objection to the sophisticated-means enhancement. Gammage did not contest the underlying facts of the offense contained within the PSI. Gammage simply contended "the offense conduct . . . outlined in the presentence report" was not sufficient to show Gammage used sophisticated means. Gammage explained he "certainly did the things he is charged in the criminal information with doing, but it does not meet the sophisticated means as that term is defined."

G.    *The District Court's Fact Findings*

After reviewing the PSI and considering the parties' arguments, the district court overruled both of Gammage's objections. First, the district court found Gammage's offense involved more than 50 victims. In doing so, the court rejected Gammage's legal argument that those who have been repaid do not count as "victims." The district court explained it "[d]oesn't make any difference if today

9

[the victims] are not owed money, they are still victims." The district court recognized the amount Gammage still owed to each victim "goes to how much the restitution may be." However, the court reasoned "[i]f a person was cheated out of their money, and then repaid, that's admirable," but "[t]hat doesn't mean they were not cheated out of their money."

Second, the district court found Gammage's offense involved sophisticated means. The court accepted the underlying fact findings in the PSI and observed "they are not objected to." The district court adopted the PSI's recommendation to enhance Gammage's sentence for sophisticated means. Specifically, the district court found Gammage's crime "was very well planned and carried out by the defendant according to the sentencing guidelines."

At the end of the sentencing hearing, the court asked Gammage if he had any objections. Gammage's attorney replied, "None, save the objections raised in the [PSI]."

## II.  DISCUSSION

On appeal, Gammage makes two arguments. First, he argues the district court erred by applying the 4-level enhancement for an offense involving at least 50 victims because there was no competent evidence before the district court of more than 50 victims. Second, he argues the district court erred by finding Gammage's offense involved sophisticated means. We reject both arguments.

A.    *Number of victims*

The district court did not clearly err in finding that Gammage's offense involved at least 50 victims. *See United States v. Rodriguez*, 732 F.3d 1299, 1305 (11th Cir. 2013) ("This Court reviews . . . underlying factual findings, including the District Court's calculation of the number of victims, for clear error."). The PSI contained a victim chart listing more than 50 clients who had suffered loss at some point in time. Gammage did not object that this chart accurately showed the number of clients he at one point defrauded. Therefore, the district court was entitled to rely on the victim chart in concluding Gammage's offense involved at least fifty victims. *See United States v. Wade*, 458 F.3d 1273, 1277 (11th Cir. 2006) ("It is the law of this circuit that a failure to object to allegations of fact in a PSI admits those facts for sentencing purposes."); *United States v. Aguilar-Ibarra*, 740 F.3d 587, 592 (11th Cir. 2014) ("Indeed, the defendant's failure to object to conclusory statements in the [PSI] renders those statements undisputed and permits the sentencing court to rely upon them without error even if there is an absence of supporting evidence." (quotations omitted)).

To be clear, Gammage's only objection as to number of victims in the district court was a legal objection—i.e., that the number of "victims" under the Guidelines should not, as a matter of law, include individuals who have been reimbursed. The district court did not err by overruling this objection. *See United*

11

*States v. Lee,* 427 F.3d 881, 894-95 (11th Cir. 2005) (rejecting the argument that people who have been reimbursed cannot qualify as victims for purposes of § 2B1.1(b)(2)(A)).

B.    *Sophisticated Means*

The district court also did not clearly err in finding Gammage's offense involved sophisticated means for purposes of applying the § 2B1.1(b)(10)(C) enhancement. *See United States v. Ghertler*, 605 F.3d 1256, 1267 (11th Cir. 2010) ("We review the district court's findings of fact related to the imposition of sentencing enhancements, including a finding that the defendant used sophisticated means, for clear error." (quotations omitted)). "Sophisticated means" is defined as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1 comment. (n.9(B)).

The record is replete with evidence that Gammage employed sophisticated means to defraud his victims. Gammage's fraud was not, as he argues, "a simple, 'garden-variety' crime." Rather, it required careful and continual deception and planning carried out over at least four years. From January 2008 until January 2012, Gammage capitalized on The Gammage Firm's established reputation among injured workers to manipulate prospective clients into entrusting him with their money. Gammage then exploited his specialized knowledge and training in the law to negotiate settlements with third parties on his clients' behalf. He did

12

this even though he knew he did not have his clients' authorization to settle. Upon receiving the settlement checks, Gammage forged his clients' names and deposited the checks into accounts from which he drew personal funds.

Gammage employed various tactics to conceal and extend his fraud and to lull his clients into a false sense of security. Gammage deliberately failed to disclose information about his clients' settlements and refused to provide clients an accurate accounting of their settlement funds. When clients asked about their settlement money, Gammage frequently misdirected them by blaming third parties, like the IRS, or by blaming the ubiquitous "red tape." Gammage's pattern of excuses and lies went on for several years, with Gammage stealing more than $2 million before being caught. He was able to continue the scheme undetected for so long, in part, by giving cash payments to clients under the guise of "advances" and "interest-free loans." These cash payments were likely drawn from money owed to previous victims, given that Gammage commingled his own funds with his clients' funds. In this sense, Gammage's law firm operated like a classic, Ponzi scheme, where "[m]oney from the new investors is used directly to repay . . . earlier investors." *See* BLACK'S LAW DICTIONARY 1348 (10th ed. 2014)

We therefore disagree with Gammage's assertion that "there was nothing complex or sophisticated in the execution or concealment of Gammage's fraud." The facts of this case illustrate a complex, well-planned fraud that Gammage

carefully concealed for four years.  Based on the totality of the record, we cannot say "we are left with the definite and firm conviction that" the district court erred in finding Gammage's crime involved sophisticated means.  *See U.S. Commodity Futures Trading Comm'n v. Hunter Wise Commodities, LLC*, 749 F.3d 967, 974 (11th Cir. 2014) (quotations omitted).

**AFFIRMED**.