**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

COMMODITY FUTURES TRADING
COMMISSION,
           *Plaintiff-Appellee,*

    v.

WHITE PINE TRUST CORPORATION, a
California Corporation; RICHARD
MATTHEWS,

           *Defendants,*

    and

STEPHAN BAERE,
           *Defendant-Appellant.*

No. 07-56629

D.C. No.
CV-04-02093-J

OPINION

Appeal from the United States District Court
for the Southern District of California
Napoleon A. Jones, District Judge, Presiding

Argued and Submitted
March 4, 2009—Pasadena, California

Filed August 3, 2009

Before: Diarmuid F. O'Scannlain, Pamela Ann Rymer, and
Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge O'Scannlain

10071

## COUNSEL

Dirk T. Metzger, Esq., San Diego, California, argued the cause for appellant and filed briefs.

Nancy R. Page, Assistant General Counsel, Commodity Futures Trading Commission, Washington, D.C., argued the cause for appellee and filed briefs; Terry S. Arbit, General Counsel, and Bradford M. Berry, Deputy General Counsel, Commodity Futures Trading Commission, Washington, D.C., were also on the briefs.

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether the Commodities Futures Trading Commission has jurisdiction over certain activities involving foreign currency.

I

In 2000, Richard R. Matthews, Jr., formed White Pine

Trust Corporation ("White Pine") as a holding company for investment funds, including the Pinnacle Capital Fund ("Pinnacle").[1] Investors in Pinnacle were told that they had accounts representing investments in the trading of the fund. Investors were not to place orders for specific products; instead, White Pine claimed in its Prospectus that it would manage the accounts in the fund according to one of two trading strategies. These strategies combined trading in the spot and options markets for foreign currency. White Pine also told customers it would keep the money customers invested in Pinnacle segregated into individual accounts.

In 2002, Matthews hired Stephen Baere as the Director of Business Development for White Pine. Part of Baere's job was to solicit money from the public to invest in Pinnacle. He solicited in person at trade shows and elsewhere and through White Pine's website.

As it turned out, Pinnacle, and White Pine in general, did not do much trading. Instead, the parties agree, Matthews stole the money of investors for himself. Indeed, the accounts to which investors contributed were commingled with general funds, over which Matthews had control. Though he claims not to have known that Matthews was pocketing Pinnacle funds, Baere concedes that he solicited money from investors by, in part, lying to them at Matthews' direction.

After some preliminary investigation, the Commodity Futures Trading Commission ("CFTC") filed a civil proceeding against White Pine and Matthews in October of 2004, adding Baere as a defendant one month later. The CFTC sought and obtained a preliminary injunction against Baere to freeze his assets, to make his assets and records available to the CFTC for discovery, and to prohibit Baere from destroying records.

---

[1]The facts as we state them come either from the district court's summary or from uncontroverted portions of the record before the district court.

The government had also initiated criminal prosecutions against all three defendants. Soon after the CFTC added Baere as a defendant, he accepted a plea agreement. While admitting that he actively solicited investments in Pinnacle by misrepresenting facts, Baere did not concede that White Pine offered foreign currency options.

A

The CFTC's First Amended Complaint (the operative complaint) rested the agency's jurisdiction on several provisions of the Commodity Exchange Act ("the Act"), the statute governing the reach of the CFTC and commodities regulation. Whether this provision actually supports the CFTC's jurisdiction over this case is the central issue on appeal. The CFTC sought injunctive relief pursuant to 7 U.S.C. § 13a-1, which authorizes such relief against persons who have violated, are violating, or are about to violate any provision of the Act or the regulations thereunder. The agency also sought disgorgement and restitution.

The complaint charged Baere, Matthews, and White Pine with one count of fraud by misappropriation and solicitation in violation of 7 U.S.C. § 6c(b) and 17 C.F.R. §§ 1.1, 32.9(a) and (c), and one count of offer and sale of illegal off-exchange options contracts in violation of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.11(a). The cases against White Pine and Matthews soon resolved themselves without much litigation.

B

As the litigation in Baere's case proceeded to discovery, the CFTC refused to respond to some of his interrogatories and requests for admission. Baere successfully moved to compel responses to all of the discovery requests pertaining to the jurisdictional issue—whether he traded in or offered transactions to others in foreign currency options. The CFTC responded as directed, but Baere remained unsatisfied. He

argued that the CFTC had to provide an expert analysis of 400 pages of documents pertaining to White Pine's trading activity to determine whether options trading actually occurred. The magistrate refused to compel the CFTC to perform the analysis and Baere objected.

The district court overruled this objection. It concluded that the CFTC's jurisdiction does not turn on whether White Pine actually traded options, because the CFTC only alleges that Baere offered options transactions to clients. In any event, the district court ruled that even if the CFTC did have to prove actual trading, it had met its discovery obligations by producing over "400 pages of trading documents identified by Bates Stamp number."

In the meantime, the CFTC had moved for summary judgment, which the district court granted. Baere timely appeals from such judgment along with the district court's denial of his motion to compel. Significantly for our purposes, Baere only contests the district court's determination that the CFTC has jurisdiction to bring this case.[2] He does not challenge the

_____

[2]Baere has framed his argument as a challenge to the jurisdiction of the district court over this case. Indeed, he ties his attack on the district court's grant of summary judgment to the initial motion to dismiss that he made under Federal Rule of Civil Procedure 12(b)(1) (dismissal for want of subject-matter jurisdiction).

But the CFTC brought its complaint under a federal law (the Commodity Exchange Act), and thus there is federal question jurisdiction under 28 U.S.C. section 1331 unless "the alleged claim under the . . . federal statute[ ] clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such claim is wholly insubstantial and frivolous." *Bell v. Hood*, 327 U.S. 678, 682-83 (1946); *see also Black v. Payne*, 591 F.2d 83, 86 n.1 (9th Cir. 1979) (noting that the contention that a given instrument is not "a security" and therefore a securities fraud action would not lie goes to whether plaintiff states a claim, not whether the court has subject-matter jurisdiction). His argument that the CFTC lacks jurisdiction to bring the case is thus akin to a claim that there is no cause of action provided by the statute, an argument that at the motion to

district court ruling that, as a matter of law, he engaged in actionable fraud under the relevant statutes. We therefore assume that he has.

## II

The CFTC claims it has jurisdiction to bring this case under three sections of the Act: 7 U.S.C. §§ 2(c)(2)(B), 6c(b), and 13a-1. For reasons that will appear, we address the statutory provisions in reverse order.

**[1]** In its complaint, the CFTC sought injunctive relief, civil fines, and disgorgement and restitution under 7 U.S.C. § 13a-1. That section provides that:

> [w]henever it shall appear to the Commission that any . . . person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of this chapter or any . . . regulation . . . thereunder, . . . the Commission may bring an action in the proper district court of the United States . . . to enjoin such act or practice, or to enforce compliance . . . and said courts shall have jurisdiction to entertain such actions.

§ 13a-1(a). The statute also allows the CFTC to seek, and allows the court to impose, civil penalties "[i]n any action brought under [the same] section." § 13a-1(d)(1).[3] Standing

---

dismiss stage would be brought under Rule 12(b)(6), not Rule 12(b)(1). We therefore read Baere to argue, at the summary judgment stage, that the CFTC cannot bring this action under its statute, rather than that there is no subject-matter jurisdiction.

The language of the CFTC statute, however, speaks in terms of jurisdiction. But this refers to the jurisdiction of the *CFTC*. While we adopt the statutory terms, we clarify that they speak only of the CFTC's power to bring its claims, not of the federal courts' jurisdiction to hear the case.

[3]Again, although the statute purports to grant the district court jurisdiction to entertain certain actions, in fact it is stating the relief available to the CFTC regarding the claims it is permitted to bring.

alone, these subsections grant no jurisdiction; the CFTC must allege and, on summary judgment, show a violation of the Act or of its regulations.

**[2]** Indeed, the CFTC alleges Baere violated 7 U.S.C. § 6c(b) and 17 C.F.R. §§ 1.1, 32.9(a) & (c), and 32.11(a), all of which prohibit fraud and misrepresentation in the solicitation or offering of options. These substantive provisions, however, do not confer jurisdiction on the CFTC by themselves. Section 6c(b) of the Act merely prohibits anyone from "offer[ing] to enter into, enter[ing] into or confirm[ing] the execution of, *any transaction involving any commodity regulated under this chapter* which *is* of the character of, or is commonly known to the trade as, an 'option' . . . contrary to any . . . regulation of the Commission prohibiting any such transaction." § 6c(b) (emphases added).

**[3]** Section 6c(b), then, only prohibits those transactions in options contrary to CFTC regulations if they are regulated under the Act, that is, if Congress has granted jurisdiction to the CFTC to regulate them and to bring civil actions pertaining to them. Such regulations, of course, cannot go beyond the jurisdictional limits of the statute. Even if they could, the regulations incorporate by reference the same limits that subsection 6c(b) does. *See* 17 C.F.R. § 32.1(a) ("The provisions of this part . . . shall apply to all commodity option transactions . . . pursuant to [7 U.S.C. § 6c(b)] and the regulations promulgated thereunder."); 17 C.F.R. § 1.1(a) ("The provisions of this section shall be applicable to accounts, agreements, contracts, or transactions described in section 2(c)(1) of the Act, to the extent that the Commission exercises jurisdiction over such accounts, agreements, contracts and transactions as provided in section 2(c)(2)(B) of the Act.").

**[4]** Thus, all roads lead back to section 2 of the Act, which is captioned "Jurisdiction of Commission." 7 U.S.C. § 2. Section 2(c) exempts from the statute's coverage "agreement[s], contract[s], [and] transaction[s] in" certain financial instru-

ments, including foreign currency. § 2(c)(1)(A).[4] Subsection (c)(2)(B), on which the CFTC bases its jurisdictional claims, restores coverage over a specific subset of transactions in foreign currency. In particular, it grants the CFTC jurisdiction over "an agreement, contract, or transaction in foreign currency that is a contract of sale of a commodity for future delivery . . . or an option . . . ; and is offered to, or entered into with, a person that is not an eligible contract participant, unless the counterparty . . . is [certain types of entities]." § 2(c)(2)(B)(i)(I)-(II). The parties do not dispute that Baere never solicited money from any "eligible contract participants" within the meaning of the statute and that White Pine was not one of the exempted counterparties. Therefore, it seems the CFTC can bring its action only if it can show "an agreement, contract or transaction in foreign currency . . . that is . . . an option[ ] *and* is offered to, or entered into with, [a retail investor]." *Id.* (emphasis added).

## III

We discern three lines of reasoning in Baere's argument that there remain genuine issues of material fact precluding summary judgment in favor of the CFTC on this required jurisdictional showing. First, the CFTC has not shown any trading in actual options; second, White Pine did not offer options but rather offered the service of discretionary account management; third, any trading would have included trades in the spot as well as option markets.

## A

[5] Baere first claims that subsection 2(c)(2)(B)(i) grants

---

[4]We note that Congress amended Subsection (2)(c) in 2008. *See* Pub. L. 110-234, § 13101(a), and Pub. L. 110-246, § 13101(a). The amendments did not change the language to which we refer in this opinion, but it did rearrange the numbering of some of the relevant statutory subsections. We employ the current numbering.

the CFTC jurisdiction only over offers of options if the offeror actually completes a trade in them. He points to the language of the provision, which extends the Act's coverage over "agreements, contracts, and transactions in foreign currency" that meet two requirements. First, they must be options. § 2(c)(2)(B)(i)(I). Second, they must be offered or entered into with someone other than an eligible contract participant. § 2(c)(2)(B)(i)(II). Baere argues that the first requirement means that any offer have an actual option behind it. In other words, Baere maintains that the CFTC has no jurisdiction when someone offers options without ever conveying any options or even without ever having access to options to convey. As the CFTC correctly points out, this would mean that the Act does not regulate "fraudulent options solicitations simply because the funds obtained were stolen rather than invested as promised."

But the logic of the statutory language does not compel such a counterintuitive result. Clause (I) seems merely to require that *what is "offered"* under clause (II) be, in fact, an option (or other contract of sale of a commodity for future delivery), as opposed to a trade in actual foreign currency. One can offer something without actually possessing or having any intention to convey to the offeree the thing offered. Take the example of someone who says, "I will give you a car if you give me $100," but then pockets the money and flees the country. There is a car *that is offered*—the hypothetical car that the offeror deceived the offeree into believing was for sale—even though no actual car-for-money trade ever occurred and even though the offeror never even had a car to sell. In other words, if someone offers to sell a car without having the car to sell, he still offers a car (as opposed to, for example, a bicycle) for sale; he just did so fraudulently.

Baere's reading also risks making clause (II) incoherent. Such clause extends the CFTC's jurisdiction over any option that is offered to *or* entered into with certain persons. If offers of options had to end in actual entry into options transactions,

then the separate provision in clause (II) for a transaction "entered into" would be redundant. It is generally disfavored to interpret statutes to create redundancy. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (internal quotation marks omitted)). All the more so where the redundant interpretation also strains common sense.[5]

[6] We therefore reject Baere's contention that the CFTC must show that he offered to trade an option and actually traded an option in order to bring this case. Under subsection 2(c)(2)(B)(i), there must be an offer (§ 2(c)(2)(B)(i)(II)) of an option (§ 2(c)(2)(B)(i)(I)); the CFTC need not show a consummated options trade or the possession by the offeror of an option for sale or purchase.

B

1

Baere next claims that by soliciting money for White Pine he was not offering customers any particular financial product, whether options or anything else, but rather a service—discretionary investing. He insists that, because subsection 2(c)(2)(B)(i) requires "an option" that "is offered," it is not enough to solicit money for a discretionary management account that may invest in options. In other words, Baere argues, White Pine was not selling goods, it was selling its

---

[5]Of course, it might be that an option "that is offered" refers to cases where the offeror has an option to sell but the sale is never consummated, as opposed to a case, like this one, where the offeror has no option to sell and never intends any sale. But nothing in the statute requires us to split hairs in such a bizarre and apparently pointless fashion. If the best that one can say for Baere's proposed interpretation is that it is possible in theory but absurd in practice, then we must decline the proposal.

services as a money-managing agent for putative investor-principals.

The CFTC's responses to this argument have been surprisingly unclear and muddled. The CFTC seems to argue that the standard practice in the industry is not for retail investors to purchase options directly from the grantor of those options. The Act contains some evidence of this view. It recognizes that so-called "futures commission merchants" may offer dealer options, granted by others, for sale to investors.[6] 7 U.S.C. § 6c(d). The merchant acts like a brokerage firm—an intermediary between the grantor of the dealer option and the retail investor. *Id.* at § 6c(d)(2)(B). Thus, it seems most grantors of dealer options do not offer options directly to investors the way a traveling salesman hawks his wares directly to his customer. *See also* 1 *Derivatives Regulation* § 1.06[1] ("The futures commission merchant is at the heart of the selling effort in the commodity futures industry . . . . The futures commission merchant, if in the securities business, would probably be called a *brokerage house*.").

But to accept that idea is not to resolve this case. Although the CFTC suggested at oral argument that White Pine essentially acted as an unregistered futures commission merchant, White Pine does not appear to have acted as a broker or anything similar. White Pine offered to manage the money of investors, not to place orders on options or any other financial instrument. White Pine offered its customers investments in what we have previously referred to as a "discretionary commodities trading account." *Cf. Lopez v. Dean Witter Reynolds Inc.*, 805 F.2d 880, 884-85 (9th Cir. 1986) (holding that discretionary commodities trading account with individualized

---

[6]Dealer options are options on physical commodities (as opposed to options on futures) which do not trade on a registered exchange. 1 Philip McBride Johnson & Thomas Lee Hazen, *Derivatives Regulation* § 1.02[10] (2004). The parties do not dispute that White Pine purported to deal in the off-exchange market.

accounts was not a commodity pool under the Act). While it might make sense to view a broker, who accepts a specific order for options, as offering options when he solicits investors, we cannot say the same of a fund or discretionary account manager.[7]

The CFTC points out that White Pine's solicitation materials stated that it might invest customers' money in options, but the materials' recitals do not thereby offer options. In order to see why, we return to the precise language of the Act.

[7] Subsection 2(c)(2)(B)(i) gives the CFTC jurisdiction in this context only over "an agreement, contract, or transaction in foreign currency that is . . . an option [and] . . . is offered to" a retail customer. The Act defines "option" as "an agreement, contract, or transaction that is of the character of, or is commonly known to the trade as, an 'option', 'privilege', 'indemnity', 'bid', 'offer', 'put', 'call', 'advance guaranty', or 'decline guaranty'." 7 U.S.C. § 1a(26). While this definition may not seem particularly helpful, it does tell us that an "option" for purposes of the Act is not a term of art. In the trade, an option means the contract whereby the creator (or writer) of the option grants to the purchaser "the right, for a specified period of time, to either buy or sell the subject of the option

_____

[7]Indeed, some staff members of the CFTC appear to have recognized the difference between an entity like White Pine and a futures commission merchant. A letter from the agency's Division of Trading and Markets noted that "[g]enerally, a firm that, for compensation or profit, advises others as to the value of or advisability of trading in futures or options contracts, or issues analyses or reports concerning the foregoing, is a commodity trading advisor . . . . Advising others includes exercising discretionary trading authority over a customer's account." CFTC Staff Letter No. 01-91, [2000-2002 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 28,705 (CFTC Div. Trading & Markets Dec. 12, 2001); *cf.* 7 U.S.C. § 1a(6) (defining "Commodity Trading Advisor"). We express no position on whether the CFTC could have sought relief on the argument that White Pine was an unregistered Commodities Trading Advisor doing business illegally. *Cf.* 7 U.S.C. § 6n.

at a predetermined price." 1 *Derivatives Regulation* § 1.02[10].

[8] Though asked numerous times to do so at oral argument, counsel for the CFTC could not clearly point to the "agreement, contract or transaction in foreign currency," in this case, "that is an option" in this sense. Whatever agreement White Pine entered into with its customers pursuant to the Prospectus could not have been an option because it merely would have allowed White Pine to trade the money of its customers at the discretion of its fund managers. It would have permitted White Pine to respond to the offers of others—perhaps futures commission merchants—to purchase options. But the agreement between White Pine and its customers was not itself the option that was offered.[8]

2

[9] Though we accept Baere's distinction between options and discretionary trading accounts, it proves rather more than he bargained for. This is because subsection 2(c)(1), the jurisdiction-stripping provision, uses similar language as subsection 2(c)(2)(B), the jurisdiction-restoring provision. In other words, though subsection 2(c)(2)(B)(i) does not restore jurisdiction to the CFTC over accounts involving options, it does not have to do so because subsection 2(c)(1) never withdrew the jurisdiction in the first place. The latter provision removes jurisdiction over "agreement[s], contract[s], or transaction[s]" *but not accounts*, "in (A) foreign currency." 7 U.S.C. § 2(c)(1). Thus the reach of subsection 2(c)(2)(B), which partially returns the jurisdiction removed, turns out not

---

[8]We have previously held that a discretionary commodities trading account is not a security within the meaning of the Securities Act of 1933. *See, e.g.*, *Lopez*, 805 F.2d at 884-85; *Mordaunt v. Incomco*, 686 F.2d 815, 817 (9th Cir. 1982). This bears some weight, for it shows that a discretionary account that may trade in a financial instrument is not the same thing as the instrument itself.

to matter. What does matter is whether the Act applies to off-exchange trading through discretionary trading accounts in foreign currency options in the first place. Here Baere makes the dispositive argument. We asked the parties to brief whether any provision of the Act (other than subsections 2(c)(1) or 2(c)(2)(B)) would grant the CFTC jurisdiction, and the CFTC pointed to section 6c(b), one of the other portions of the statute on which it relied in its complaint.[9] Section 6c(b) prohibits anyone from "offer[ing] to enter into . . . any transaction involving any commodity regulated under this chapter which is of the character of . . . an 'option.' " 7 U.S.C. § 6c(b). But as we have explained, subsection 6c(b) is not a jurisdiction-granting statute. While the CFTC suggests that foreign currency is a commodity "regulated under" the Act by virtue of subsection 2(c)(2)(B), that is the very provision we have just explained does *not* apply to Baere.

[10] We are persuaded that neither subsection 2(c)(2)(B) nor subsection 6c(b) grants the CFTC jurisdiction over discretionary trading accounts in foreign currency options. Congress may well have considered providing jurisdiction to the CFTC over fraudulent solicitations of the kind at issue here. But the CFTC has not been able to point to any language in the Act that bears such interpretation. Therefore, we must conclude that it does not have power to bring this action.[10]

---

[9]Baere's motion to enlarge his supplemental brief is hereby granted.

[10]We express no opinion on whether other jurisdictional provisions of the Act extend coverage to discretionary commodities accounts. Because the CFTC did not base its jurisdictional claim on subsection 2(a)(1)(A), we do not reach the question of whether the CFTC's jurisdiction "with respect to accounts . . . involving contracts of sale of a commodity for future delivery," 7 U.S.C. § 2(a)(1)(A), applies to a discretionary trading account like the one at issue in this case.

Because it is unnecessary, under the circumstances, we do not reach Baere's third argument, that the CFTC lacked jurisdiction because he only solicited investments in spot trades, not in options trades.

IV

**[11]** We have concluded that the CFTC lacks the power to bring this action. Baere is therefore entitled to have the case dismissed. In this posture, Baere's appeal of the district court's denial of his motion to compel discovery is moot.

V

For foregoing reasons, we REVERSE the district court's grant of summary judgment and REMAND with instructions to DISMISS the case.