**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CONFEDERATED TRIBES OF THE COLVILLE RESERVATION, | No. 24-5565 |
| *Plaintiff - Appellant*, | D.C. No. 2:04-cv-00256-SAB |
| and | |
| JOSEPH A. PAKOOTAS, an individual and enrolled member of the Confederated Tribes of the Colville Reservation, DONALD R. MICHEL, an individual and enrolled member of the Confederated Tribes of the Colville Reservation, | OPINION |
| *Plaintiffs*, | |
| STATE OF WASHINGTON, | |
| *Intervenor-Plaintiff*, | |
| v. | |
| TECK COMINCO METALS LTD, a Canadian corporation, | |
| *Defendant - Appellee*. | |

Appeal from the United States District Court
for the Eastern District of Washington
Stanley Allen Bastian, District Judge, Presiding

Argued and Submitted April 17, 2025
Seattle, Washington

Filed September 3, 2025

Before: Ronald M. Gould and Richard A. Paez, Circuit
Judges, and Michael J. McShane, Chief District Judge.[*]

Opinion by Judge Gould

---

## SUMMARY[**]

### Environmental Law

In an interlocutory appeal, the panel reversed the district
court's summary judgment in favor of Teck Cominco Metals
Ltd. and remanded for trial on the Confederated Tribes of the
Colville Reservation's claims for natural resource damages
under § 107(a)(4)(C) of the Comprehensive Environmental
Response, Compensation, and Liability Act against Teck.

The Tribes' claims were based on Teck's contamination
of the Upper Columbia River with hazardous substances

---

[*] The Honorable Michael J. McShane, United States Chief District Judge
for the District of Oregon, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

from its lead-zinc smelter in British Columbia, resulting in injuries to fish and benthic organisms in the river. The Tribes sought damages for their members' interim lost use of the injured natural resources. The district court granted summary judgment on the basis that the Tribes sought damages for injured "cultural resources," not "natural resources," and that claims involving damages with a cultural component are not cognizable under CERCLA.

The panel agreed with the district court that natural resource damages under CERCLA are only available to address injury to natural resources, defined under the statute as "land, fish, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources." But the panel held that this definition does not mean that natural resource trustees can only recover damages to restore or replace natural resources that are directly injured by the release of a hazardous substance. Rather, natural resource damages under CERCLA normally include restoration costs at a minimum, plus interim lost-use value in appropriate cases. Considering CERCLA's text and its restorative purpose, and agreeing with the D.C. Circuit, the panel held that CERCLA authorizes damages for lost uses of injured natural resources in cases where the lost uses have a cultural dimension.

## COUNSEL

Paul J. Dayton (argued), Daniel J. Vecchio, and Alexandrea M. Smith, Ogden Murphy Wallace PLLC, Seattle, Washington, for Plaintiff-Appellant.

Andrew A. Fitz and Joshua A. Osborne-Klein, Assistant Attorneys General, Ecology Division, Office of the Washington Attorney General, Olympia, Washington, for Intervenor-Plaintiff.

Anne M. Voigts (argued), Pillsbury Winthrop Shaw Pittman LLP, Palo, Alto, California; Amanda G. Halter, Pillsbury Winthrop Shaw Pittman LLP, Houston, Texas; Deborah B. Baum, Pillsbury Winthrop Shaw Pittman LLP, Washington, D.C.; Mark E. Elliott, Pillsbury Winthrop Shaw Pittman LLP, Los Angeles, California; Bryce J. Wilcox and Kammi M. Smith, Witherspoon Brajcich Mcphee PLLC, Spokane, Washington; for Defendant-Appellee.

Brian J. Cleary and Dianne L. Herz, Cleary Law Group PC, Hayden, Idaho, for Amicus Curiae Spokane Tribe of Indians.

Rex S. Heinke and Jessica M. Weisel, Complex Appellate Litigation Group LLP, Los Angeles, California, for Amicus Curiae His Majesty the King in Right of the Province of British Columbia.

Joseph M. Manning, David S. Gualtieri, and Mary G. Sprague, Attorneys, Environment & Natural Resources Division; Todd Kim, Assistant Attorney General; United States Department of Justice, Washington, D.C.; for Amicus Curiae the United States.

Kendra A. Martinez, Tribal Attorney, Suquamish Indian Tribe, Suquamish, Washington; Michael M. Frandina, The

Askman Law Firm, Denver, Colorado; for Amicus Curiae Suquamish Indian Tribe.

Julie A. Weis, Haglund Kelley LLP, Portland, Oregon, for Amicus Curiae Confederated Tribes of Siletz Indians.

Kelly L. Perigoe and Hannah T. Nguyen, King & Spalding LLP, Los Angeles, California, for Amici Curiae the Canadian Chamber of Commerce and the Mining Association of Canada.

Thomas L. Murphy and Ada M. Stepleton, Native American Rights Fund, Boulder, Colorado; Winter Hayes, Nez Perce Tribe, Lapwai, Idaho; Diana R. Bob, Native Law PPLC, Bellingham, Washington; Josh Newton, Best Best & Krieger LLP, Bend, Oregon; Tom Zeilman, Law Offices of Thomas Zeilman, Yakima, Washington; for Amici Curiae Nez Perce Tribe, the Confederated Tribes of the Umatilla Indian Reservation, the Confederated Tribes of the Warm Springs Reservation of Oregon, and the Confederated Tribes and Bands of the Yakama Nation.

William M. Jay and Isabel M. Marin, Goodwin Procter LLP, Washington, D.C.; Tawny A. Bridgeford, National Mining Association, Washington, D.C.; Andrew R. Varcoe and Stephanie A. Maloney, U.S. Chamber Litigation Center; for Amici Curiae the National Mining Association, American Exploration & Mining Association, and Chamber of Commerce of the United States of America.

**OPINION**

GOULD, Circuit Judge:

This appeal concerns the Confederated Tribes of the Colville Reservation's (the "Colvilles" or "Tribes") claims for natural resource damages under section 107(a)(4)(C) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a)(4)(C), against Teck Cominco Metals, Ltd. ("Teck"), a Canadian corporation. The Tribes' claims are based on Teck's contamination of the Upper Columbia River with hazardous substances from its lead-zinc smelter in Trail, British Columbia, resulting in injuries to fish and benthic organisms in the river. The Tribes seek damages for their members' interim lost use of the injured natural resources between the time of the release of the hazardous substances and potential restoration. The district court granted Teck summary judgment on the Tribes' damages claims, holding that the Tribes sought damages for injured "cultural resources," not "natural resources," and that claims involving damages with a cultural component are not cognizable under CERCLA. We have jurisdiction under 28 U.S.C. § 1292(b) and we reverse the district court's grant of summary judgment on the Tribes' claims for natural resource damages and remand for trial.

## I. FACTS AND PROCEDURAL HISTORY

### A

This case concerns the Upper Columbia River, roughly 150 miles of river and reservoir in Washington State, bounded to the north by the Canada-U.S. border and to the south by the Grand Coulee Dam. The Colvilles are a

federally recognized tribe comprised of twelve individual tribes whose members claim they have lived on the banks of the Upper Columbia River since "time immemorial." The Upper Columbia River forms the eastern and southern boundary of the Colville Reservation and holds great cultural significance to the Tribes.

Teck, a Canadian mining company, owns a smelter on the banks of the Columbia River, ten miles north of the Canadian border, in Trail, British Columbia. The district court found that between 1930 and 1995, Teck discharged about 400 tons of slag daily—an estimated 9.97 million tons in total—directly into the Columbia River. The slag discarded into the river contained 7,300 tons of lead and 255,000 tons of zinc. In addition to slag, Teck also discharged untold gallons of contaminated effluent directly into the Columbia River. The effluent discharged into the river between 1923 and 2005 contained about 132,000 tons of hazardous substances, including 108,000 tons of zinc, 22,000 tons of lead, 200 tons of mercury, 1,700 tons of cadmium, and 270 tons of arsenic. What was once the lifeblood of the Tribes, now became a toxic dumping ground, impacting the relationship the Tribe had with the river.

## B

Litigation regarding the contamination of the Upper Columbia River commenced in 2004 when two members of the Tribes brought a CERCLA citizen suit against Teck. These plaintiffs were later joined by the State of Washington as a plaintiff-intervenor and by the Colville Tribes as a co-plaintiff. The district court trifurcated the case to sequentially determine: (1) whether Teck was liable as a potentially responsible party; (2) Teck's liability for

response (i.e., cleanup) costs; and (3) Teck's liability for natural resource damages.

In Phase I of trial, the district court concluded that Teck was liable as an arranger under CERCLA section 107(a)(3), § 9607(a)(3), and that Teck was jointly and severally liable to the Tribes and the State in any subsequent action or actions to recover past or future response costs at the Upper Columbia River site under CERCLA section 107(a)(4)(A), § 9607(a)(4)(A).

In Phase II, the State settled its claim for past response costs while the Tribes proceeded to trial. The district court found in favor of the Tribes and awarded them $3,394,194.43 in investigative expenses incurred through December 31, 2013, $4,859,482.22 in attorney's fees up to that date, and $344,300.00 in prejudgment interest. Teck appealed, and we affirmed the district court's judgment. *Pakootas v. Teck Cominco Metals, Ltd*, 905 F.3d 565, 574, 596 (9th Cir. 2018).

The district court then proceeded with Phase III of the case to determine Teck's liability for damages to natural resources. The Tribes and the State brought joint claims for natural resource damages based on injury to benthic organisms in the river sediment and elevated mercury levels in fish, including claims for damages for the public's lost use of those natural resources. Along with these joint damages claims, the Tribes also separately seek natural resource damages for their interim lost uses of the injured natural resources that are specific to their members because of their unique relationship with the Upper Columbia River. The Tribes' experts opined that the Tribes sustained natural resource damages as a result of: (1) reduced tribal fishing trips due to state-issued advisories concerning unsafe

mercury levels in fish; (2) the interim lost use of an uncontaminated river; and (3) the interim lost use of the injured natural resources for cultural purposes.[1]

Teck moved for partial summary judgment on the Tribes' separate natural resource damages claims, arguing in part that CERCLA does not authorize natural resource damages for cultural service losses.[2]   The district court granted the motion, reasoning that the Tribes in effect sought damages for cultural resources that are not authorized under CERCLA.    The Tribes moved for reconsideration, contending that Teck and the court misconstrued their claims and emphasizing that they sought natural resource damages, not cultural resource damages.  The district court denied the Tribes' motion for reconsideration.  The Tribes then moved to certify the summary judgment order for interlocutory appeal under 28 U.S.C. § 1292(b).   The district court reiterated its previous holding and granted the motion while acknowledging that "there is a conflict between the holding in *State of Ohio* which claims 'nonuse' services are actionable under CERCLA and this Court's Order determining that such claims are not cognizable under

---

[1] The Colvilles state that their second and third categories of damages are alternative approaches to damages.

[2] CERCLA refers to recovery of damages for the "use value" of injured natural resources, 42 U.S.C. § 9651(c)(2), but the implementing regulations and the governing caselaw have used a variety of other terms to describe the same concept, including "lost use," "interim lost use," and "service loss."  *See* 43 C.F.R. § 11.83; *State of Ohio v. U.S. Dep't. of the Interior*, 880 F.2d 432, 448 (D.C. Cir. 1989).  The Tribes originally referred to their claims as "tribal service loss" claims, but on appeal they refer to their claims as claims for their "interim lost use" of injured natural resources.  In this opinion, we refer to the Tribes' claims as lost use or interim lost use claims.

CERCLA if they involved damages with a cultural component." *See State of Ohio v. U.S. Dep't of the Interior*, 880 F.2d 432 (D.C. Cir. 1989). We granted interlocutory review of the district court's summary judgment order dismissing the Tribes natural resource damages claims.

## II.  STANDARD OF REVIEW

We review *de novo* a grant of summary judgment. *Lolli v. Cnty. of Orange*, 351 F.3d 410, 414 (9th Cir. 2003). When considering a grant of summary judgment, we view the evidence in the light most favorable to the nonmoving party, and we determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.*

## III.  DISCUSSION

The Tribes contend that the district court erred in granting summary judgment to Teck on their claims for natural resource damages by characterizing the claims as "cultural resources" injury and concluding that CERCLA does not authorize damages for injuries to such "cultural resources." The Tribes contend that they are not seeking damages for injured cultural resources, but rather for their lost use of injured natural resources where their lost use has a cultural dimension in light of the Tribes' unique relationship with the Upper Columbia River. We use the traditional tools of statutory interpretation to determine whether the district court erred by dismissing the Tribes' natural resource damage claims as a matter of law, and whether § 9607(a)(4)(C) authorizes damages for the interim lost uses of injured natural resources in a case where the diminished uses have a cultural dimension.

CERCLA was enacted "[t]o provide for liability, compensation, cleanup, and emergency response for hazardous substances released into the environment and the cleanup of inactive hazardous waste disposal sites." *State of Idaho v. Hanna Mining Co.*, 882 F.2d 392, 394 (9th Cir. 1989) (alteration in original) (citing Pub. L. No. 96–510, 94 Stat. 2767 (1980)).  CERCLA makes potentially responsible parties jointly and severally liable not only for "all costs of removal or remedial action," but also for "damages for injury to, destruction of, or loss of natural resources, including the reasonable cost of assessing such injury, destruction, or loss resulting from such a release [of a hazardous substance]." § 9607(a)(4)(A), (C).  "Indian" Tribes, in addition to the United States and the states, may sue as natural resource trustees to recover these natural resource damages. § 9607(f)(1).

Congress conferred on the President (who in turn delegated to the Department of the Interior ("Interior")) the responsibility for promulgating regulations to address how these natural resource damages would be assessed. § 9651(c)(1); *State of Ohio*, 880 F.2d at 439.  Congress stated that the regulations must:

> identify the best available procedures to determine [natural resource] damages, including both direct and indirect injury, destruction, or loss and shall take into consideration factors including, but not limited to, replacement value, use value, and

ability of the ecosystem or resource to
recover.  § 9651(c)(2).

The statute also states that the measure of natural
resources damages "shall not be limited by the sums which
can be used to restore or replace [natural] resources."
§ 9607(f)(1).

Interior promulgated its first round of regulations
assessing natural resource damages in 1986.  51 Fed. Reg.
27,674 (Aug. 1, 1986) (codified at 43 C.F.R. pt. 11).  This
first round of regulations prescribed a hierarchy of
methodologies by which the lost-use value of natural
resources could be measured, focusing exclusively on
market values for such resources when market values were
available.  *State of Ohio*, 880 F.2d at 462 (citing *id.*).
Interior's regulations were reviewed by the D.C. Circuit in
*State of Ohio*, which held that "Congress intended the
damage assessment regulations to capture fully all aspects of
loss," and that Interior had "erroneously construed the
statute" to preclude certain methods for determining the lost-
use value of natural resources.  *Id.* at 463–64.  The D.C.
Circuit remanded the regulations to Interior with instructions
to "consider a rule that would permit trustees to derive use
values for natural resources by summing up all reliably
calculated use values, however measured," including
"'passive' use" or "non-consumptive" values such as
"[o]ption and existence values" which "reflect utility derived
by humans from a resource, and thus, *prima facie*, ought to
be included in a damage assessment."  *Id*. at 464.  The D.C.
Circuit defined option value as "the dollar amount an
individual is willing to pay although he or she is not
currently using a resource but wishes to reserve the option to
use that resource in a certain state of being in the future."  *Id.*

at 475 n.72.  And it defined existence value as the "dollar amount an individual is willing to pay although he or she does not plan to use the resource, either at present or in the future.  The payment is for the knowledge that the resource will continue to exist in a given state of being."  *Id.* at 476 n.73.

Interior revised its regulations in response to *State of Ohio*.  Adhering to the D.C. Circuit's reading of the scope of CERCLA's natural resource damages provisions, the current implementing regulations provide that recoverable damages for the interim lost use of natural resources are measured by "both public use and nonuse values such as existence and bequest values."  43 C.F.R. § 11.83(c)(1).  "Use value" is defined as "the economic value of the resources to the public attributable to the direct use of the services provided by the natural resources."  § 11.83(c)(1)(i); *see also* 43 C.F.R. § 11.14(nn) (defining "[s]ervices" as "the physical and biological functions performed by the resource including the human uses of those functions.").  "Nonuse value," on the other hand, represents "the economic value the public derives from natural resources that is independent of any direct use of the services provided."  § 11.83(c)(1)(ii).

Here, the Tribes have identified natural resource injuries from Teck's release of hazardous substances into the Upper Columbia River—injured benthic organisms and injured fish with elevated mercury levels—and seek damages for their members' interim lost use of those natural resources.  The Tribes provide three methods for quantifying their interim lost use of the injured natural resources: (1) reduced river trips by Tribal members due to the mercury-based fish consumption advisories; (2) the interim lost use of an uncontaminated river; and (3) the interim lost use of the injured natural resources for cultural purposes.  The Tribes'

first lost use claim measures the Tribes' reduced river use due to the mercury-based fish advisories issued over the years and applies an enhanced value based on the role of fishing in the Colvilles' culture. The Tribes' second claim is derived from a contingent valuation study that was based on the nonuse or "existence value" of an uncontaminated Upper Columbia River. The Tribes' third claim reflects the Tribes' alternative measure of damages for use and nonuse service losses as a result of the injured natural resources. The Tribes acknowledge that their uses of the injured natural resources include a cultural component because of their unique relationship with the Upper Columbia River.

We agree with the district court that natural resource damages under CERCLA are only available to address injury to natural resources. Natural resources are defined as "land, fish, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources." 42 U.S.C. § 9601(16); 43 C.F.R. § 11.14(z). But, contrary to the district court's conclusion, this definition does not mean that natural resource trustees can only recover damages to restore or replace natural resources that are directly injured by the release of a hazardous substance. Congress made this explicit by instructing that natural resource damages "shall not be limited by the sums which can be used to restore or replace natural resources." § 9607(f)(1). Section 9651(c)(2) requires that the regulations for assessing natural resource damages consider, among other factors, "use value," and read together with § 9607(f)(1)'s "shall not be limited by" language, directs that "the measure of damages must not only be sufficient to cover the intended restoration or replacement uses in the usual case but may in some cases exceed restoration cost by incorporating interim lost use value as well." *State of Ohio*, 880 F.2d at 448. This means

that natural resource damages under CERCLA "normally include restoration costs at a minimum, plus interim lost-use value in appropriate cases." *Alaska Sport Fishing Ass'n v. Exxon Corp.*, 34 F.3d 769, 772 (9th Cir. 1994) (emphasis omitted) (quoting *State of Ohio*, 880 F.2d at 454 & n.34). The Tribes seek damages for their interim lost use of injured natural resources, and the district court erred by rejecting the Tribes' claims as claims for cultural resource damages without assessing whether CERCLA authorizes damages for lost uses of injured natural resources in cases where the lost uses have a cultural dimension. We complete that analysis here.

We start with CERCLA's text. When Congress ordered the President to promulgate regulations to guide the assessment of natural resource damages, it included a broad array of recoverable damages in its directive. The regulations had to:

> identify the best available procedures to determine such damages, including *both direct and indirect injury*, destruction, or loss and shall take into consideration factors *including, but not limited to*, replacement value, *use value*, and ability of the ecosystem or resource to recover.     § 9651(c)(2) (emphasis added).

Congress did not limit the types of recoverable natural resource damages, nor specify the types of approved "uses." *See id.*; § 9607(f)(1). Instead, it provided that recoverable damages must include at least those specified in the statute, including "use value." § 9651(c)(2).

CERCLA does not define "use value," *id.*, so this term is given its ordinary meaning. *U.S. Commodity Futures Trading Comm'n v. Monex Credit Co.*, 931 F.3d 966, 973 (9th Cir. 2019). Webster's Dictionary in 1979, the year before CERCLA was enacted, defined "use" to include "a method or manner of employing or applying something" and "a particular service or end." *Webster's New Collegiate Dictionary* 1279 (1979). Nothing in this common meaning of the word suggests that lost uses that have a cultural component fall outside the scope of recoverable lost use damages authorized by the statute. *See* § 9651(c)(2).

Interpreting CERCLA to authorize damages for the lost use of injured natural resources where the lost use has a cultural component is consistent with CERCLA's restorative purpose. A core pillar of the statute's purpose is to "assure that parties responsible for hazardous substances [bear] the cost of remedying the conditions they created." *Pinal Creek Grp. v. Newmont Mining Corp.*, 118 F.3d 1298, 1300 (9th Cir. 1997). Although response actions are one method towards accomplishing this objective because they seek to remove or isolate hazardous substances from the environment to prevent or minimize future harm from the contamination, such response costs are not designed to repair the harm to natural resources that occurred while the contamination was not yet contained, including the disruption of any human uses of the natural resources. *See* § 9607(a). This is where a cultural component of natural resource damages must be considered. *See* § 9607(a)(4)(C). Reading in new limitations to CERCLA's natural resource damages provisions, such as by holding that CERCLA does not authorize damages for the lost use of injured natural resources where the lost use has a cultural component, would fall short of "Congress's intent to [permit] recover[y] for the

full damages resulting from a release." *Nat'l Ass'n of Mfrs. v. U.S. Dep't of Interior*, 134 F.3d 1095, 1112 (D.C. Cir. 1998) (citing *State of Ohio*, 880 F.2d at 464).  It is clear beyond doubt that Congress aimed at providing full recovery of any damages to those persons harmed by the loss of natural resources.  To do that, damages occasioned by lost human activities must be considered.

The D.C. Circuit's opinion in *State of Ohio*, which the district court acknowledged it did not consider when dismissing the Tribes' interim lost use claims, also supports our holding that CERCLA authorizes damages for the lost use of injured natural resources including where the lost use has a cultural component.  In *State of Ohio*, the D.C. Circuit held that Congress intended the regulations assessing natural resource damages to "capture fully all aspects of loss[,]" and to "permit trustees to derive use values for natural resources by summing up all reliably calculated use values," including "'passive' use," or "nonuse" values, like "existence values" which "reflect utility derived by humans from a resource and thus, *prima facie*, ought to be included in a damage assessment."  880 F.2d at 463–64, 476 n.77.  We agree with the D.C. Circuit that CERCLA authorizes lost use claims based on "reliably calculated" values that "reflect utility derived by humans from a resource," provided that "the trustee does not double count [the values.]"  *Id.* at 464.  Under the D.C. Circuit's interpretation of § 9651(c)(2), passive uses like "existence values" are an authorized measure of damages under the statute, and we see no reason why the Tribes' lost use claims, which include both active and passive uses of injured natural resources bearing cultural significance, would fall outside CERCLA's broad scope because their lost uses "reflect utility derived by humans from a resource." *See id*. at 463–64.  Whether the Tribes can

prevail on their damages claims will include questions about methodology and whether the Tribes' claims include any double counting, but these factual issues can only be properly determined after trial and full consideration of the evidence, including expert testimony.  It was error for the district court to dismiss the Tribes' claims as a matter of law by characterizing the claims as unauthorized under CERCLA.  The fact issues not yet determined require a trial, not a summary judgment.

Next, we address the two cases the district court relied upon in its order, which we conclude are unpersuasive: *Coeur d'Alene Tribe v. Asarco Inc.*, 280 F. Supp. 2d 1094 (D. Idaho 2003) and *In re Gold King Mine Release*, 669 F. Supp. 3d 1146 (D.N.M. 2023).  Neither case addresses damages for the interim lost use of injured natural resources under CERCLA, and therefore, neither case affects our analysis or conclusion that the Tribes' damages claims are authorized under CERCLA.

First, in *Coeur d'Alene Tribe*, the district court made a factual finding that reads like a legal conclusion, stating that "[c]ultural uses of water and soil by the Tribe are not recoverable as natural resource damages."  280 F. Supp. 2d at 1107.  The court did not provide any statutory interpretation analysis or other reasoning why interference with cultural uses due to contamination of natural resources was not a cognizable claim for natural resource damages under CERCLA.  *Id*.  Without any analysis of lost use claims or discussion of the D.C. Circuit's opinion in *State of Ohio*, this case is unpersuasive.

We also conclude that *In re Gold King Mine Release* is not persuasive.  In that case, the district court examined the issue of whether certain "restorative damages claims"

brought by the Navajo Nation under state tort law were preempted by CERCLA's natural resource damages provisions. 669 F. Supp. 3d at 1159–60. The damages the Navajo Nation sought were for the stated purpose of restoring the confidence of the Navajo Nation's members in the San Juan River as a natural resource. *Id.* at 1156. In holding that the claims were not preempted by CERCLA, the district court rejected the defendant's characterization of the claim as one for natural resource damages and said that, while the claim was connected to the contamination from a gold mine spill, the restorative damage claims sought to remedy "injuries that are distinct from the injury to the River." *Id.* at 1160. Here, determining whether the Colvilles' damages claims seek to remedy injuries that are distinct from the injury to the Upper Columbia River is a factual question that the district court will need to determine on remand, but this factual question is separate and apart from the legal question we are tasked with answering on appeal: whether CERCLA authorizes damages for the interim lost use of natural resources when the lost use has a cultural component. Because *In re Gold King Mine Release* does not analyze the scope of natural resource damages under CERCLA, let alone the recoverability of damages for the interim lost use of injured natural resources, it too does not support dismissal of the Tribes' damages claims at the summary judgment stage. *See id.* at 1157–60.

We hold that the district court reversibly erred when it concluded that the Tribes sought damages for injuries to cultural resources and that cultural resource damages are not authorized under CERCLA. Nothing in the statute or in the caselaw suggests that interim lost uses of injured natural resources which have a cultural component, either because cultural perspectives inform the determination of the value

of the interim lost use or because the injured natural resources have cultural uses, should be excluded as a matter of law from lost use damages authorized by CERCLA under § 9651(c)(2). We reverse the district court's dismissal and remand the case for trial to determine whether the Tribes have sustained any damages from lost uses of injured natural resources.

## IV.  CONCLUSION

For the reasons stated herein, we reverse the district court's grant of summary judgment rejecting the Tribes' separate claims for natural resource damages and remand the case for trial.

**REVERSED AND REMANDED FOR TRIAL.**